# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CT-00610-SCT

*JACK D. BODNE*

*v.*

*ALICE SUSAN KING*

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT:                     03/22/2000
TRIAL JUDGE:                          HON. PAT WISE
COURT FROM WHICH APPEALED:            HINDS COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:               MERRIDA COXWELL
ATTORNEY FOR APPELLEE:                DONALD W. BOYKIN
NATURE OF THE CASE:                   CIVIL - DOMESTIC RELATIONS
DISPOSITION:                          JUDGMENT OF COURT OF APPEALS
                                      REVERSED AND CHANCERY COURT
                                      JUDGMENT REINSTATED AND AFFIRMED -
                                      01/23/2003
MOTION FOR REHEARING FILED:
MANDATE ISSUED:


**EN BANC.**

**PITTMAN, CHIEF JUSTICE, FOR THE COURT:**

¶1.     Alice Susan King Bodne (Susan) was granted a divorce from her husband , Jack D. Bodne (Jack),
on grounds of habitual cruel and unusual treatment. Jack appealed. A divided Court of Appeals decided
that the trial court's ruling was based on an insufficient finding of facts and reversed. ***Bodne v. King***, 2001
WL 808357 (Miss. Ct. App. 2001). We granted certiorari to address the matters raised by the Court of
Appeals. We reverse the judgment of the Court of Appeals and reinstate and affirm the judgment of the
trial court.

## FACTS

¶2. The Bodnes were married in 1994. The couple made their home in Jackson and had no children together. Jack was about sixty years old and owned his own business. Susan was also middle-aged and had grandchildren by a prior marriage. She worked as a salesperson for a pharmaceutical company. Susan described her employer as "very straight-laced" and her position as one of "high profile" which required her to come in frequent contact with physicians. At the time of the marriage, Jack's past included a conviction for possession of cocaine and a conviction for falsifying a federal document. Susan was aware of those parts of Jack's past before the marriage.

¶3. The marriage appears to have been at least tolerable to Susan for a time, although she would later complain of the strain caused by Jack's frequent ridicule and his embarrassing brand of sexual humor. Their memories of their first years were vastly different. Susan recalled a lot of screaming and fighting, and her witnesses corroborated one or more of these episodes. One witness testified that it was a "common thing" for Jack to scream at Susan until a household chore was completed. Jack recalled their time together as a rather enjoyable period in which the couple "never" fought and he never had occasion to raise his voice.

¶4. The strains of marriage worsened considerably for Susan when Jack was indicted in 1997 for conspiring to murder three business competitors. The indictment was amended in 1999 to a three-count charge of attempted murder. Jack's indictment was reported in the press, including the local TV news.

¶5. Jack and Susan separated shortly after Jack's arrest and confinement in September of 1997. Susan testified that Jack put "a lot of pressure" on her to keep his company running in his absence. She struggled to maintain Jack's business and her own job. Around the time of the separation, Jack found occasion to charge Susan with assault. Although Susan was required to go to court to face the charge, Jack did not appear to prosecute it.

2

¶6. Around this same time Susan received a call from an agent of the U.S. Customs Service. After she granted the permission the agent requested, federal and state officers showed up at the house to examine the couple's home computer. What the officers hoped to find is not entirely clear but, with Susan standing by watching, what they did find was images of child pornography stored on the hard drive. The officers then asked Susan to provide copies of her children and grandchildren for comparison to the pictures. At that point Susan's corroborated testimony was that she ran outside with an acute attack of nausea.

¶7. Jack testified that the pornography must have been planted by a law officer out to get him. Jack did not explain how or when this evidence planting might have occurred. The discovery led to no additional charges against Jack by the time of the divorce trial two years later.

¶8. Susan testified that her mortification from these events led to depression marked by loss of weight and appetite, requiring her to seek psychiatric care and medication. She also testified that she began to fear for her physical safety, and she sought and obtained a restraining order against Jack.

¶9. Having heard the evidence, the chancellor made her findings and conclusions from the bench, immediately at the end of testimony. Those findings and conclusions were in part as follows:

> This [Chancery] Court specifically finds on the grounds of divorce alleged by Ms. Susan King that she has met her burden of proof, that being by a preponderance of the evidence on her habitual, cruel and inhuman treatment. Our case law certainly has said that conduct is not necessarily limited in habitual, cruel and inhuman treatment that there be a threat of life, limb or health, that the Court should consider testimony that goes to the conduct, and if that conduct is so unnatural as to make the marriage revolting to the offended spouse and render it impossible for that spouse to discharge the duties of the marriage, thus destroying the basis for its continuance. Further, our Supreme Court has said, behavior is measured subjectively and by its effect on the offended spouse, offenses continuing in nature and not condoned by the mere continuation of cohabitation.

3

This Court is of the opinion based upon the credible testimony of not only Ms. King, but her two corroborating witnesses, that Mr. Bodne has inflicted habitual, cruel and inhuman treatment through the marriage, especially given the incidence of the indictments and the ultimate imprisonment--well, when he was in jail for the indictment. The Court recognizes that it is not considering the guilt or innocence of any indictment that has been handed to Mr. Bodne. That in and of itself has no specific bearing on the Court's decision. However, what does have bearing is the testimony of Ms. King that throughout that period of time that she could not sleep properly, eat properly, that she was under the care of a psychiatrist, and that the pressure of trying to maintain the business of the parties created stress that was for Ms. King specifically something that she could not handle.

Additionally, the Court recognizes and finds credible her statements regarding her embarrassment, humiliation regarding the jokes and the fixation in terms of the types of jokes Mr. Bodne enjoyed and the profanity.

For those reasons, this Court would direct and order that a divorce be granted to Ms. King on the grounds of habitual, cruel and inhuman treatment based upon a preponderance of the evidence.

¶10.    Jack appealed two elements of the trial court's judgment. He argued that Susan failed to prove sufficient facts to constitute cruel and unusual treatment and, also, that the chancellor erred in treating two parcels of real estate as marital property subject to equitable distribution.

¶11.    The Court of Appeals found that the chancellor's findings of fact were insufficient to justify a divorce on the fault-based ground of habitual cruel and unusual treatment. In reaching this conclusion, the court limited itself to a consideration of the conduct specifically referenced in the chancellor's bench ruling. Thus constrained, the Court of Appeals found that Jack's indictment and boorishness were the only matters which could properly be considered on appeal and that such conduct was not enough to justify the chancellor's conclusion. In the absence of specific findings, testimony concerning other conduct would not

4

be considered as proven if Jack offered a denial of the conduct. For example, the testimony regarding child pornography could not be considered. The judgment of divorce was therefore reversed, and the property division was made moot.

## DISCUSSION

### I.       WHETHER THERE WAS SUFFICIENT EVIDENCE OF CRUEL AND UNUSUAL TREATMENT TO SUPPORT THE CHANCELLOR'S DIVORCE DECREE.

¶12.    We begin by referring to that portion of the chancellor's bench decision which is excerpted above. That excerpt shows that the chancellor made some specific findings of fact, which the Court of Appeals later found insufficient to meet the standard of proof.

¶13.    There is no question that there are areas of the law where specific findings are mandated. A division of marital assets is one such area. *Fisher v. Fisher*, 771 So. 2d 364, 369 (Miss. 2000); *Ferguson v. Ferguson*, 639 So. 2d 921, 929 (Miss. 1994). If findings are not mandated by the nature of the case, procedural rules are applied to determine whether findings should be made. *Lowery v. Lowery*, 657 So.2d 817, 818-19 (Miss. 1995). In a case tried without a jury, the court "may" make specific findings of facts and conclusions of law, but "shall" do so when requested by a party or by if required by another rule. M.R.C.P. 52(a). A uniform chancery court rule says essentially the same thing, and the uniform rule recites that it is made pursuant to Rule 52. Unif. Chan. Ct. R. 4.01. While a chancellor is not directed by rule to make findings and conclusions in the absence of a request, whether findings should be made is a separate question and depends largely on the complexities of the case. *See* M.R.C.P. 52 cmt.

¶14. Here Jack did not request, through objection at trial or post-trial motion, that the chancellor make amended or additional findings. Notwithstanding that failure, the rule permits him to challenge the sufficiency of the evidence on appeal. M.R.C.P. 52(b). However, whether additional or amended findings are requested affects the standard of review.

¶15. If a request is made and no ruling is entered, the appellate court must consider the effect of the trial court's missed responsibility, and overwhelming evidence may be required as a condition for affirmance. *Lowery*, 657 So. 2d at 819. If no request is made, as here, the appellate court accepts facts specifically found unless manifestly wrong. The court will then review the record and presume that the chancellor resolved, in the appellee's favor, those fact issues not specifically found. *Owen v. Owen*, 798 So. 2d 394, 398 (Miss. 2001); *Bryant v. Cameron*, 473 So.2d 174, 179-80 (Miss. 1985); *Cheek v. Ricker*, 431 So. 2d 1139, 1143-44 (Miss. 1983). Where the presumption applies, the chancellor's decision will stand if it is supported by substantial and credible evidence. *Owen*, 798 So. 2d at 398.

¶16. An appellate court will view the facts of a divorce decree in a light most favorable to the appellee. *Richard v. Richard*, 711 So. 2d 884, 888 (Miss. 1998). If specific findings are made without clear error, the appellate court will draw from those findings all reasonable inferences which support the trial court's ruling. *Bruce v. Bruce*, 687 So. 2d 1199, 1203 (Miss. 1996); *Mullins v. Ratcliff*, 515 So.2d 1183, 1189 (Miss. 1987).

¶17. Our determination of the proper scope of review is particularly applicable to appeals of fault-based divorces. In *Fisher*, 771 So. 2d at 368, this Court affirmed a divorce for habitual cruelty after conducting its own examination of the record. A de novo review of another record resulted in a reversal of a finding of habitual cruelty where the only finding was that there was "sufficient testimony" to warrant a divorce.

6

*Potts v. Potts*, 700 So. 2d 321, 322 (Miss. 1997). In a case involving the fault-based ground of adultery where no facts were found, the Court of Appeals reached similar conclusions to those stated here. After careful review of precedent, the Court of Appeals' recent opinion demonstrates that an absence of findings is frequently decried, then followed by a de novo review to determine if the record supports the fault-based divorce *Curtis v. Curtis*, 796 So. 2d 1044, 1047-50 (Miss. Ct. App. 2001).

¶18.    In a bench trial, the trial judge has sole authority to determine the credibility of the witnesses. *Bell v. Parker*, 563 So. 2d 594, 597 (Miss. 1990). Here, the chancellor made a specific finding that Susan and her witnesses were credible. That finding is not qualified or limited, and there is a special endorsement of the testimony regarding the indictment. The finding is not manifestly wrong. No finding was made regarding Jack's credibility. An entirely reasonable, if not inescapable, inference is that the testimony by and for Susan should be given substantial weight, while Jack's testimony should be given correspondingly less weight.

¶19.    Different standards of proof apply to the different grounds of fault-based divorce. Adultery, for example, requires clear and convincing proof. *Rushing v. Rushing*, 724 So.2d 911, 917 (Miss. 1998). Habitual cruel and unusual treatment is proved by the less stringent preponderance of the evidence standard. *Smith v. Smith*, 614 So.2d 394, 396 (Miss.1993). If that standard is met to the chancellor's satisfaction, the judgment below will not be disturbed unless we find a manifest error of law or fact. *Chaffin v. Chaffin*, 437 So.2d 384, 386 (Miss. 1983).

¶20.    Habitual cruel and unusual treatment is defined as conduct that (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the offended party, or (2) is so unnatural and infamous as to make the marriage revolting to the offended spouse and

7

render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance. *Daigle v. Daigle*, 626 So.2d 140, 144 (Miss.1993); *Gardner v. Gardner*, 618 So. 2d 108, 113-14 (Miss. 1993); *Rawson v. Buta*, 609 So. 2d 426, 431 (Miss. 1992).

¶21. While the facts in this case just breach the threshold of conduct sufficient to support granting a divorce based upon habitual cruel and unusual treatment, we find the chancellor's judgment to be supported by the evidence. Most of the conduct in this case correlates to the second category of habitual cruelty described in *Daigle*. Proof on this ground does not require maltreatment which is intended for or directed at the offended spouse. Instead, it can be established by the effect of "unnatural and infamous" conduct upon the offended spouse.

¶22. Seldom will conduct fit neatly into a single category, and the facts in this case present elements which somewhat overlap the two categories. For example, it is undisputed that Jack filed assault charges against Susan, subjecting her stress and embarrassment. The pressure put on Susan to carry on Jack's business is another example. Those are types of behavior which were specifically directed at Susan.

¶23. The words "unnatural and infamous" have not been precisely defined by precedent because the plain meanings of those words are sufficient. Such conduct is found or not found on a case by case basis. Cases involving cruel and unusual conduct have typically presented unusual and unique factual situations, and it is impossible to provide a list of unmistakable bright-line markers of such conduct. There are, however, some guidelines which give a sense of the conduct necessary to provide a threshold. Physical violence directed at the offended spouse is not required. *Richard*, 711 So.2d at 889 (slovenly behavior coupled with accusations of incest held sufficient). Mere unkindness, rudeness, petty indignities, frivolous quarrels, incompatibility or lack of affection are not sufficient. *Steen v. Steen*, 641 So.2d 1167, 1170

8

(Miss. 1994); *McKee v. Flynt,* 630 So.2d 44, 48 (Miss. 1993). One set of conduct evincing habitual cruel and unusual conduct is ill-founded accusations, threats and malicious sarcasm, insults and verbal abuse which cause such mental suffering as to destroy health and endanger the life of an innocent spouse. *Chamblee v. Chamblee*, 637 So.2d 850, 859 (Miss.1994).

¶24.    There is a dual focus on the conduct of the offending spouse and the impact of that conduct on the offended spouse. *Fisher*, 771 So. 2d at 368. The effect of the conduct on the offended spouse is determined by a subjective standard, which is to say that an attempt is made to weigh the likely effects of the conduct on the offended spouse, as opposed to a normative standard. *Morris v. Morris*, 783 So.2d 681, 688 (Miss. 2001); *Talbert v. Talbert*, 759 So.2d 1105, 1110 (Miss. 1999); *Faries v. Faries*, 607 So.2d 1204, 1209 (Miss. 1992).

¶25.    While a criminal indictment obviously does not equate to a conviction, an indictment for three counts of attempted murder is serious business for all concerned. An indictment is a determination by a grand jury that probable cause exists to hold the person indicted for trial. *Stevenson v. State*, 244 So.2d 30, 33 (Miss. 1971). The indictment against Jack was introduced into evidence at the trial for divorce. Unfortunately for him, the stain of the indictment might never be removed completely from Jack or his family, even in the event that he is acquitted. It has become a matter of public record and media fixation. Susan testified of matters relating to the charges against Jack which gave her cause for grave concern. The chancellor apparently found this testimony "especially" compelling and credited this testimony towards the ultimate finding. Under the precise facts of the case, we cannot say that the chancellor was manifestly wrong.

¶26.    The indictment is not all there is to consider and weigh.  There is the testimony that Susan was frequently subject to verbal abuse in the time before the indictment.  There is the assault charge Jack brought against Susan but never prosecuted.  There is the testimony regarding the pressure Jack placed on Susan to continue his business in his absence.  There was testimony regarding Jack's selfish use of marital assets.  Those are among the matters which can be deemed to have been proved to the chancellor's satisfaction under the standard of review and given the ruling on credibility.

¶27.    Finally, there are the questions surrounding the child pornography on the home computer.  The parties were the only ones with access to the computer.  Both testified that Susan was computer illiterate or barely literate.  Jack made no claim that Susan had planted the pornography.  Instead he blamed a law enforcement officer who, Jack said, had a personal vendetta against him.  Yet Susan testified that she watched the officers boot the computer and stayed until they found the offensive materials, and she said the officers never inserted anything into the computer.  Jack never revealed what the officer stood to gain or did gain from the alleged vendetta.  Susan's testimony was corroborated and credible; there was no finding regarding Jack's.

¶28.    We accept circumstantial evidence as proof of adultery because of its typically secretive nature, even though adultery has a higher standard of proof than habitual cruelty.  *Holden v. Frasher-Holden*, 680 So.2d 795, 798 (Miss. 1996).  Child pornography is likewise of a secretive nature.  In these facts we can infer that the chancellor counted the facts surrounding the child pornography as additional proof of unnatural and infamous conduct.

¶29.    The sum of the evidence supports a finding of unnatural and infamous conduct.  The chancellor found that such conduct had an impact on Susan's health.  These findings are not manifestly wrong.  The

10

chancellor applied the correct standard of proof.  The chancellor's judgment granting a divorce should be reinstated.

## II.    WHETHER THE CHANCELLOR ERRED IN THE DIVISION OF MARITAL PROPERTY.

¶30.    The appeal also challenged the division of marital property, but only insofar as two parcels of land. The chancellor deemed the two parcels to be marital property subject to division.  Each party got one of the parcels.

¶31.    Jack believes that one of the  parcels should have been classified as his separate property. Therefore, he argues, the property division was inequitable because Susan was credited with a share of his separate property.  The Court of Appeals did not reach that issue because of its reversal of the divorce made the matter moot.

¶32.    The fact is that by the time of the divorce Jack had conveyed to Susan the property he now claims as separate property.  Although the property may have had separate status before the marriage, it appears to have been commingled by this conveyance.  *Maslowski  v.  Maslowski*, 655 So. 2d 18, 20 (Miss. 1995).  Also, there was conflicting testimony about contributions, and use and misuse of marital assets by the two parties.

¶33.    The chancellor attached credibility to Susan's testimony.  Jack concedes that the chancellor followed the rules for equitable division set out in *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994). The equitable distribution of marital assets is committed to the discretion of the chancellor and is not disturbed absent clear error or application of an erroneous legal standard. *Arthur v. Arthur*, 691 So.2d 997, 1003 (Miss.1997) (citing *Ferguson*, 639 So.2d at 930).  This issue has no merit.

11

¶34.    In summary, the judgment of the Court of Appeals is reversed, and the judgment of the trial court

is reinstated and affirmed.

¶35.    **JUDGMENT OF COURT OF APPEALS REVERSED AND CHANCERY COURT
JUDGMENT REINSTATED AND AFFIRMED.**

**SMITH, P.J., WALLER, COBB, DIAZ, EASLEY, CARLSON AND GRAVES, JJ.,
CONCUR.  McRAE, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**